FILED
 2023 Jun-21  AM 09:59
 U.S. DISTRICT COURT
 N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **CHRISTY KEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No.: 5:22-cv-0384-LCB |
| | ) |
| **KILOLO KIJIKAZI,** *Acting Commissioner, Social Security Administration*, | ) ) ) |
| **Defendant.** | |

## MEMORANDUM OPINION

On March 25, 2022, the Claimant, Christy Key, filed a complaint seeking judicial review of an adverse decision of the Commissioner of the Social Security Administration ("the Commissioner") pursuant to 42 U.S.C. § 405(g).  The Commissioner filed an answer and a copy of the administrative record on June 27, 2022.  (Doc. 7).  Key filed a brief in support of her position on August 11, 2022, and the Commissioner filed a response on October 11, 2022.  Key did not file a reply brief.  Accordingly, the issues are now fully briefed, and Key's case is ripe for review.  For the reasons that follow, the Commissioner's final decision is due to be affirmed.

**I.     Background**

Key protectively filed an application for a period of disability and disability insurance benefits on April 21, 2020, alleging disability beginning August 2, 2017, but later amending the onset date to April 1, 2020. (Tr. at 10)[1]. The claim was denied initially on July 24, 2020, and upon reconsideration on October 16, 2020. Key then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 17, 2021. Key testified at the hearing, as did an impartial vocational expert ("VE"). The ALJ subsequently issued an unfavorable decision. Key requested review of the ALJ's decision by the Appeals Council, but that request was denied on February 2, 2022, and the ALJ's decision became the Commissioner's final decision. This lawsuit followed.

## II.   The ALJ's decision

After the hearing, the ALJ issued a written opinion explaining his decision. (Tr. at 10-24). In issuing his decision, the ALJ followed the five-step evaluation process set out by the Social Security Administration. *See* 20 CFR 416.920(a). The steps are followed in order and, if it is determined that the claimant is or is not disabled at a particular step of the evaluation process, the ALJ will not proceed to the next step.

---

[1] "Tr" denotes the page numbers in the transcript prepared by the Commissioner appearing in the Court's CM/ECF system at (Doc. 7).

The first step requires the ALJ to determine whether the claimant is engaging in substantial gainful activity, which is defined as work involving significant physical or mental activities usually done for pay or profit. If a claimant is engaged in substantial gainful activity, she is not disabled, and the inquiry stops. Otherwise, the ALJ will proceed to step two. In the present case, the ALJ found that Key did not engage in substantial gainful activity during the relevant time period. (Tr. at 13). Accordingly, the ALJ moved on to the second step of the evaluation.

At step two, an ALJ is to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR 416.920(c). An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities…." *Id.* If a claimant does not have a severe impairment, she is not disabled, and the inquiry ends. If she does have a severe impairment, the ALJ will proceed to the third step. In the present case, the ALJ found that Key had the following severe impairments: multiple sclerosis ("MS"), a depressive disorder with generalized anxiety, and attention deficit disorder. (Tr. at 13), citing 20 CFR 404.1520(c).

At the third step, an ALJ determines whether the claimant's impairments or combination thereof are of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix I. If the claimant's impairment or impairments meet or equal a listed impairment, then the claimant is

disabled, and the evaluation ends. Otherwise, the ALJ proceeds to the next step. In this case, the ALJ found that Key's impairments did not meet or equal any of the listed criteria and, therefore, proceeded to step four. (Tr. p. 14).

Step four of the evaluation requires an ALJ to first determine the claimant's residual functional capacity ("RFC"), and whether she has the RFC to perform the requirements of any past relevant work. 20 CFR 416.920(f). The term "past relevant work" means work performed within the last 15 years prior to the alleged date of onset. If a claimant has the RFC to perform past relevant work, she is not disabled, and the evaluation stops. Otherwise, the evaluation proceeds to the final step. In Key's case, the ALJ found that she had the following RFC:

> The claimant has the residual functional capacity to occasionally lift and/or carry, including upward pulling, twenty pounds, and frequently lift and or carry, including upward pulling ten pounds. The claimant can sit for six hours in an eight-hour workday with normal breaks, and stand and/or walk with normal breaks for four hours in an eight-hour workday, but no greater than thirty minutes at one time with the ability to sit and change positions for a few minutes without being off task. The claimant's ability to push and/or pull, including the operation of hand or foot controls, is unlimited up to the lift and carry restriction of twenty and ten pounds. The claimant can occasionally climb ramps and stairs; she should not work on uneven surfaces or wet surfaces; she can occasionally stoop, kneel, and crouch; and she should not crawl. The claimant should not work on ladders, ropes, or scaffolds; at unprotected heights; around dangerous machinery; the claimant should not work outside where there would be temperature extremes, and no work near open flame or work around large bodies of water and no commercial driving. The claimant is limited to unskilled work and can understand, remember, and carryout uninvolved instructions. She can concentrate and remain on task for two-hour periods across an eight-hour workday, five-day workweek with all customary work breaks. Any changes in the

> work environment should be infrequent. The claimant can have occasional contact with the public, coworkers, and supervisors.

(Tr. at 16). Given this RFC, the ALJ determined that Key was unable to perform her past relevant work as a photographer. However, considering her age, education, work experience, and residual functional capacity, the ALJ found that there are jobs existing in significant numbers in the national economy that Key can perform. (Tr. at 23). Specifically, the ALJ accepted the VE's testimony that an individual with Key's RFC could perform light, unskilled jobs such as that of a garment sorter, a checker, or a router. According to the VE, those jobs exist in sufficient number in the national economy. Based on the findings above, the ALJ determined that Key was not disabled as defined by the Social Security Administration. (Tr. at 24-25).

### III.   Standard of Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. *Winschel v. Comm'r of Social Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (internal citation and quotation marks omitted). "This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Thus, while the Court must scrutinize the record as a whole, the Court must affirm if the decision is supported

by substantial evidence, even if the evidence preponderates against the Commissioner's findings. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264 (11th Cir. 2015); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

## IV. Key's arguments

Key raises two arguments in her brief, both involving the substantial evidence standard quoted above. First, she argues that the ALJ's RFC determination was not supported by substantial evidence. Second, Key contends that the ALJ's decision regarding the persuasiveness of one of Key's physicians was not supported by substantial evidence. The Court will address each argument in turn.

### A. The ALJ's RFC determination was supported by substantial evidence.

According to Key, the ALJ's determination of her RFC was not supported by substantial evidence. In her brief, Key points to her testimony at the administrative hearing at which she alleged disability due to debilitating pain, fatigue, and weakness. She testified that she gets up during the day and tries to dress herself but then sits in a chair with her legs raised because she is in such severe pain. (Tr. at 59-60). She explained that if she has a relapse of her multiple sclerosis, her husband or daughter stays home with her, and she stays in bed. (Tr. 60). Key testified that her relapses have become more severe and have taken away her ability to use her body. (Tr. at 62). She testified that her husband often stays home from work to shower

and dress her when she has a relapse. (Tr. at 63). According to Key, she has 7-10 bad days a month requiring her family stay with her while she stays in bed. (Tr. at 64). She also testified that she occasionally uses a cane, walker, or wheelchair depending on the severity of her symptoms. (Tr. at 67-68).

Although the ALJ found that Key's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he determined that her "statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 18). Accordingly, the ALJ found that Key had the RFC noted above and the consequent ability to perform certain light work in the national economy.

Key contends that the ALJ's RFC determination is based upon an incomplete review of and misunderstanding of the medical evidence. She correctly notes that an ALJ is to consider the totality of the evidence and may not "pick and choose among a doctor's records to support his own conclusion." *Chambers v. Astrue*, 671 F. Supp. 2d 1253, 1258 (N.D. Ala. 2009). Key argues that the ALJ did just that and improperly cherry-picked evidence from the record to support his conclusion even though, she says, the totality of the evidence supported a finding of disability.

As Key notes in her brief, the ALJ pointed out the following evidence in support of his conclusion: (1) objective findings on various examinations; (2) the

four- to five-month periods between visits to her neurologist; (3) Key's "'rather' stable cranial MRI's without active lesions or enhancing lesions" (Doc. 11 at 6), quoting (Tr. at 20); (4) the absence of emergency room or inpatient hospital records of multiple sclerosis exacerbations; and (5) the October 2020 opinion of the State agency consultant. Key argues that, while these findings viewed in isolation may support the ALJ's conclusion, they ignore the totality of the evidence which, Key says, supports a finding of disability.

Key identifies other medical evidence in the record tending to support her position. For example, she notes that she was admitted to the hospital in July 2018[2] for exacerbation of her MS, which was causing her lower extremities to be weak and numb. There, she reported that although her MS had been fairly controlled, there were periods over the previous six months where, for periods of two days, she would lose her vision and experience bilateral extremity weakness preventing her from walking. (Tr. at 427). However, the records note that Key reported that her weakness and numbness had improved significantly after her neurologist prescribed a higher dose of steroids. *Id.* Key was able to walk to the restroom and in the hallway while accompanied by physical therapy staff or her family. The records finally noted that Key was "deemed fit to be discharged by Neurology and by the primary team." *Id.*

---

[2] As noted above, Key's alleged onset date is April 1, 2020.

Key pointed to other records indicating that she was hospitalized in 2019 for an MS exacerbation, presenting with vertigo, nausea, vomiting, and significant weight loss. (Tr. at 502). She identified records from 2017-2019 documenting her MS symptoms which included overall pain, fatigue, the inability to walk at times, and the use of a cane and walker. (Doc. 11 at 8). In her brief, Key asserts that by May of 2020, a month after her alleged onset date, she "reported difficulty with all of her symptoms and indicated she had been so weak <u>she could not get out of bed</u>." (Doc. 11 at 8), citing (Tr. at 647) (emphasis in Claimant's Brief).[3]

Key identified other records indicating that she "was noted to be troubled with severe fatigue, vertigo, and lower extremity heaviness/fatigability." (Tr. at 1199). At a March 2021 appointment with her neurologist, Dr. Chris LaGanke, Key reported using a cane and leg brace. (Tr. at 1206). Key cited to several other instances in the record where she reported weakness, fatigue, use of a cane, the need for assistance when having MS relapses, and various forms of therapy to improve her functional independence. (Doc. 11 at 9-10). Key also pointed to evidence of mental health treatment she received beginning in at least March 2021. According to Key, she reported depression because of her MS and consequent inability to work and function independently. (Tr. at 1218).

---

[3] In reviewing the cited pages, the Court was unable to find where Key reported being unable to get out of bed.

According to Key, the ALJ's conclusion that the objective medical evidence does not support the above-noted symptoms is not supported by substantial evidence. In looking at Key's objective medical tests, the ALJ described her MRI results as "rather stable." (Tr. at 18). The ALJ also noted that there was no evidence of "active or enhancing lesions" on Key's MRIs. *Id*. at 19. Key contends that this conclusion is a mischaracterization of the results and cites to a note from Dr. LaGanke indicating that a "recent MRI demonstrated numerous white matter lesions, advanced from a prior study." (Doc. 11 at 11), citing (Tr. 614). However, that quote was taken from a report of a visit with Dr. LaGanke in September of 2017. While those records are relevant to understanding the history of Key's medical condition, the Court notes that they precede her alleged onset date by approximately three years.

Key did point to records from visits after her alleged onset date. For example, she cites Dr. LaGanke's interpretation of a September 2020 MRI in which he noted that, although there were no active lesions, there did exist "extensive cerebral demyelination consistent with [Key's] advanced MS with black holes and moderate atrophy." (Doc. 11 at 12), citing (Tr. at 710). However, Key does not explain how that finding supports her contention that the ALJ mischaracterized or misunderstood the medical evidence. The Court notes that the same record indicates there were no discernable changes from an MRI done on June 26, 2020, and that the findings were "stable over the past three months." *Id.*

10

Key concluded this portion of her argument by citing to several instances in the record wherein she reported using a cane or other assistive device to walk and needing help with daily activities. (Doc. 11 at 13). According to Key, these instances, as well as the others identified above, demonstrate that the ALJ ignored medical records that did not support his conclusion and cherry-picked records that did. However, Key failed to adequately explain how the evidence she identified contradicted the ALJ's conclusions. Rather, she has merely emphasized evidence in the record tending to support her position while downplaying the evidence the ALJ found important.

However, as Key herself noted, the ALJ's decision was based on his finding that the evidence in the record did not support the severity of the symptoms she was reporting. This conclusion, she noted, was based on a review of Key's MRI studies, the frequency of her neurology visits, the absence of emergency room visits or hospital admissions, and the October 2020 opinion of the State agency consultant, which suggested that the medical evidence was not entirely consistent with Key's reported symptoms.[4] After review of these and the other medical evidence in the record, the Court finds that the ALJ's decision was based on substantial evidence. The lack of change in Key's MRI studies after her alleged onset date as well as her

---

[4] Key did not discuss the State agency consultant's opinion in her brief.

lack of emergency room or hospital visits during that time period supports the ALJ's findings and constitutes the requisite substantial evidence.

While Key points to evidence that might suggest she is disabled or has a more limited RFC, she has not demonstrated that the ALJ relied on evidence that was not credible or was somehow improper. Essentially, Key is asking the Court to give more weight to the evidence she cited and less weight to the evidence the ALJ cited, i.e., to reweigh the evidence and find in her favor. But that would be improper. This Court's function is to determine whether the ALJ based his decision on substantial evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) ("This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence."). Even if this Court would have come to a different conclusion than the ALJ, it must affirm the Commissioner's decision if it was based on substantial evidence. For the reasons stated above, Key has failed to meet her burden of demonstrating that the ALJ's findings regarding her RFC were not supported by substantial evidence. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) ("[T]he claimant bears the burden of proving that he is disabled, and consequently, he is responsible for producing evidence in support of his claim."). Accordingly, this Court must affirm.

### B. The ALJ's determination regarding Dr. LaGanke's opinion is supported by substantial evidence.

Dr. LaGanke, Key's neurologist, submitted a letter on her behalf detailing Key's diagnoses, symptoms, limitations, and how the latter affected her ability to function in a work environment. (Tr. at 1222). At the end of his letter, Dr. LaGanke concluded that Key met the "Social Security Listing of Impairments-Adults (Part A) - Section 11.09." *Id.* However, such decisions are reserved for the Commissioner, and the ALJ did not find the letter to be persuasive. According to the ALJ, Dr. LaGanke's opinion letter was not consistent with his own records. For example, the ALJ noted that the letter in question was written more than three months after Key's last visit. Further, although Dr. LaGanke opined that Key would miss between 7 and 15 days of work every month based on her symptoms, the ALJ found such a statement to be conclusory and speculative given that Key's visits were routinely scheduled four to five months apart. In other words, the ALJ did not believe Dr. LaGanke could adequately give such an opinion about Key's potential absences given the infrequency of their visits. Additionally, the ALJ noted that Dr. LaGanke's records included notes indicating that Key was able to complete household chores like dusting and mopping. (Tr. at 22). The ALJ found Dr. LaGanke's ultimate opinion inconsistent with his records and, consequently, less than persuasive.

In her brief, Key does not adequately articulate how the ALJ erred in making this determination. Rather, she again points to portions of the record tending to support her limitations and invites this Court to make a new credibility determination

13

based on her preferred evidence. For the reasons noted in the previous subsection, that would be improper. The ALJ's findings regarding the inconsistencies in Dr. LaGanke's records are supported by substantial evidence. In addition to the inconsistencies noted above, Dr. LaGanke's records also contradicted his opinion letter in other ways. For example, while the letter stated that Key was in debilitating pain and unable to stoop or bend, Dr. LaGanke's records indicate that Key was in no apparent distress at many of her exams, was able to arise from a sitting position during the exam and was apparently able to enter and exit a vehicle.

When determining the credibility of a medical provider's opinions, Social Security regulations require an ALJ to focus on the persuasiveness of medical opinions using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors. An ALJ is to explain how he considered the factors of supportability and consistency, the two most important factors in determining a medical source's persuasiveness. *See* 20 CFR 404.1520c(b)(2). As noted above, the ALJ adequately explained his reasons for finding Dr. LaGanke's opinion to lack credibility, i.e., his opinion letter was inconsistent with and not entirely supported by his own records. The Court finds that there is substantial evidence to support the ALJ's determination. Accordingly, the ALJ's finding regarding Dr. LaGanke's persuasiveness is due to be affirmed.

**V. Conclusion**

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**DONE** and **ORDERED** June 21, 2023.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE